UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

QUENTON GALVIN AND JACOB MEISTER,

    Plaintiffs,

v.

ILLINOIS REPUBLICAN PARTY, ILLINOIS
HOUSE REPUBLICAN ORGANIZATION,
RODERICK DROBINSKI, FRIENDS OF ROD
DROBINSKI, JAMESTOWN ASSOCIATES, LLC,
AND MAJORITY STRATEGIES, INC.,

    Defendants.

No. 14 C 10490
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiffs Quenton Galvin and Jacob Meister ("Plaintiffs") filed a twenty-six count complaint against Defendants Illinois Republican Party, Illinois House Republican Organization, Roderick Drobinski, Friends of Rod Drobinski, Jamestown Associates, LLC, and Majority Strategies, Inc. alleging copyright infringement, civil conspiracy, appropriation of image, false light, and defamation. Defendant Jamestown Associates was dismissed by stipulation. The remaining Defendants ("Defendants") now move to dismiss Counts I-VII of Plaintiff's complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, Defendants' motion to dismiss is granted.

### I.     FACTUAL BACKGROUND

In early October 2014, Defendants Illinois Republican Party, Illinois House Republican Organization, Roderick Drobinski, Friends of Rod Drobinski, and Majority Strategies, Inc. intentionally authorized, printed, and mailed several thousand 8.5 by 17-inch flyers with two copies of an altered picture of Plaintiff Jacob Meister. The original picture (the "Photograph") depicts Plaintiff Meister driving a convertible in a political parade with a poster on the side of the car advertising Sam Yingling, a Democratic member of the Illinois House of Representatives who was

1

running for re-election. The Photograph was taken and copyrighted by Plaintiff Quenton Galvin, a professional photographer who authorized Sam Yingling to post the Photograph on his campaign website.

Without the permission of the photographer, Galvin, or the subject, Meister, Defendants electronically copied the Photograph from Mr. Yingling's website and altered it to appear as though Mr. Meister was driving away from the Illinois State Capitol with stolen money in the backseat and hundred dollar bills flying out of the open convertible. Defendants believed that the man driving the car was Representative Yingling rather than Plaintiff Meister, a private individual, and intended to criticize Mr. Yingling's fiscal policies.

Plaintiffs incorporated two slightly different versions of the altered Photograph in a flyer (the "Flyer") promoting Roderick Drobinski, a candidate running for State Representative opposite Sam Yingling. Superimposed above or beside the altered photographs are the words: "Mr. Yingling Went to Springfield . . . And Fiscal Responsibility Went Out the Window" and "Career Politician Sam Yingling in the Driver's Seat as Illinois Speeds Towards Higher Taxes, More Wasteful Spending, and More Jobs Lost." Defendants mailed the Flyer to several thousand potential voters leading up to the Illinois State Representative election.

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) does not test the merits of a claim; rather, it tests the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a 12(b)(6) motion, the court accepts all well-pleaded facts as true, and draws all reasonable inferences in favor of the plaintiff. *Id.* at 1521. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While legal conclusions can provide the framework of a

2

complaint, they must be supported by factual allegations." *Id*. at 679.

A plaintiff may state a claim even though there is a defense to that claim, and courts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing *United States v. Lewis,* 411 F.3d 838, 842 (7th Cir.2005). Still, when all relevant facts are presented, the court may properly dismiss a case before discovery on the basis of an affirmative defense. *See id.*

### III. DISCUSSION

#### A. Copyright Infringement and Civil Conspiracy (Counts I-VII)

Plaintiffs claim that Defendants infringed Plaintiff Galvin's copyright in violation of the U.S. Copyright Act, 17 U.S.C. § 501 by intentionally authorizing, printing, and mailing several thousand Flyers using two copies of the Photograph without Plaintiff Galvin's permission. Defendants do not dispute that Plaintiffs have adequately pled a claim of copyright infringement, as the complaint establishes the two necessary elements: (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Rather, Defendants assert an affirmative defense on the ground that the Photograph was used in the Flyer for the purpose of criticism and commentary and thus constitutes a fair use under 17 U.S.C. § 107. As with any affirmative defense, the Defendants carry the burden of proving that their unauthorized use of the Photograph constitutes a fair use. *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).

Under the Copyright Act, the exclusive rights afforded to copyright owners do not extend to "fair uses" of copyrighted works. § 107. Therefore, anyone who makes a fair use of a copyrighted work is not an infringer of the copyright with respect to such use. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984). There is no statutory definition or formula for establishing a fair use, but Congress listed "criticism, comment, [and] news reporting . . ." in the preamble of § 107 as paradigmatic examples of fair uses. *Harper & Row Publ'rs, Inc. v. Nation*

*Enterprises*, 471 U.S. 539, 592 (1985). In addition to these illustrations, Congress codified the following four factors, which courts must consider when analyzing an unauthorized use under § 107:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

U.S. Copyright Act, 17 U.S.C. § 107.

These factors are not exhaustive and represent common law jurisprudence, which Congress expected to evolve over time. *See Harper & Row*, 471 U.S. at 595 n.19. Since fair use defies precise definition, courts must analyze fair use defenses on a case-by-case basis, keeping in mind the goal of copyright protection at large—that is, "[t]o promote the Progress of Science and useful Arts . . ..". U.S. Const., Art. I, § 8, cl. 8.

As a preliminary matter, Defendants' motion to dismiss based on an affirmative defense is procedurally appropriate at this juncture.[1] It is well established that courts should refrain from granting Rule 12(b)(6) motions on affirmative defenses that turn on facts not before the court, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012), and that the fair use defense usually implicates questions of law and fact. *Harper & Row*, 471 U.S. at 549. However, a court "may conclude as a matter of law that the challenged use [does] or does not qualify as a fair use of the copyrighted work" when the facts on record are "sufficient to evaluate each of the [fair use] statutory factors." *Id.* at 560 (internal quotations and citations omitted). Such is the case here.

Plaintiff's claim is limited to the production and distribution of a single, allegedly infringing

---

[1] As the Seventh Circuit has repeatedly cautioned, the proper heading for motions on the basis of affirmative defenses is Rule 12(c) because an affirmative defense is external to the complaint. *See Brownmark Films*, 682 F.3d at 690 n.1. I am nonetheless ruling on the instant affirmative defense under the Rule 12(b)(6) heading, but future litigants should take heed of the Seventh Circuit's exhortation.

work, and both the original work and its unauthorized reproduction are attached to the complaint, allowing side-by-side review. *See Brownmark Films*, 682 F.3d at 690 (stating that despite defendants' arguments to the contrary, "the only two pieces of evidence needed to decide the question of fair use in this case are the original version of [the copyrighted episode] and the [allegedly infringing] episode at issue."). Given the limited nature of the present claim and the sufficiency of the allegations in and attachments to the complaint, the Court can evaluate each of the fair use factors at this juncture.[2]

### 1. The Purpose and Character of Defendants' Use.

The first factor to be considered in the fair use determination is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1). The Supreme Court explained that the goal of this investigation is to see "whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal quotations and citations omitted).

Defendants argue that the purpose and character of the Flyer is wholly unrelated and altogether different from the purpose of the Photograph, making their work "highly transformative." A cursory look at the two works confirms that the Photograph was created to document the campaign parade of Representative Yingling, while the Flyer was created to lambast his politics. Their difference in purpose is obvious. In the words of the Supreme Court in *Campbell*, the Flyer "transformed" the Photograph by giving it "new meaning [and] message" through political criticism. *Id. See also Dhillon v. Does 1-10*, No. C 13-01465 SI, 2014 WL 722592, at *5 (N.D. Cal. Feb. 25,

---

[2] Plaintiffs argue that discovery is needed to resolve disputes regarding material facts, such as the commercial value of the Flyer, before the Court can properly rule as a matter of law on the sufficiency of Defendants' affirmative defense. Even taking any such disputed facts in Plaintiffs' favor, the Court would not alter the outcome of the instant fair use analysis.

5

2014) (finding defendant's use of politician's headshot "transformative," because plaintiff used the photo as a tool to positively market herself as a candidate for state office while defendant used it to criticize her political views).

The critical and political nature of the Flyer, however, does not automatically tilt the scale in favor of the Defendants with respect to the first factor. The list of fair use examples in the preamble of § 107, including "criticism [and] commentary," was not meant to single out any particular use as presumptively fair. *Harper &* Row, 471 U.S. at 561. Furthermore, the politically significant nature of the subject matter of a work does not afford it any more or less copyright protection than less topical works. *Id.* at 545. Critiquing the policies of a candidate for elected office is undoubtedly essential to democratic discourse; however, the right to engage in political speech is primarily protected by the First Amendment rather than the Copyright Act. *Id.* at 556.

While the First Amendment preserves the non-exclusive right to express political speech, the Copyright Act preserves the exclusive right to use one's *fixed expressions* of political speech. *Id.* (stating that "[c]opyright laws are not restrictions on freedom of speech as copyright protects only form of expression and not the ideas expressed.") (internal citations and quotations omitted). Therefore, Plaintiff Galvin's exclusive right to use his Photograph (under the Copyright Act) can coexist with Defendants' right to criticize Mr. Yingling's policies (under the First Amendment). Contrary to the Defendants' intimation, the nature of the Flyer as political criticism does not in and of itself override the copyright protection accorded to the Photograph. *See id.* at 557 (holding that "[t]he fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public important.") (internal citations and quotations omitted).

In *Campbell*, the Supreme Court addressed the role of fair use with respect to criticism and commentary. 510 U.S. 569 (1994). There, the Court distinguished between parodies (which directly comment, at least in part, on the original work) and satires (which comment more broadly on societal

6

mores and institutions). *Id.* at 579-84. The Court held that the "parodist is justified in using the original work because a parody's effectiveness necessarily springs from recognizable allusion to its object," whereas the satirist who ridicules subjects unrelated to the work lacks the same claim to use of the work. *Id.* at 588, 580. Accordingly, parodies have "an obvious claim to transformative value," while satires face a "greater burden of proving the necessity of the[ir] use." *Id.* at 579, 580 n.14.

In this case, the Flyer critiques the politician (believed to be) pictured in it, rather than critiquing the Photograph itself. Defendants argue that the Flyer *does* comment on the underlying work insofar as it parodies the "nonchalant and reckless attitude of the man brought out by the photograph." Based on the allegations in the complaint and a perfunctory review of the Flyer, it is clear that the Defendants aimed to criticize Mr. Yingling's fiscal policy through an amusing juxtaposition of wordplay and imagery. This effect, however, could have been realized just as well through the use of a photograph depicting an intense, focused driver as opposed to a "nonchalant and reckless" one. Therefore, "[t]here's no good reason why defendants should be allowed to appropriate someone else's copyrighted efforts as the starting point in their lampoon, when so many noncopyrighted alternatives (including snapshots they could have taken themselves) were available." *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014).

In addition to the transformative value and critical nature of an unauthorized use, the copier's motivation as "commercial" versus "non-profit educational" also informs courts' first factor analyses. *See Campbell*, 510 U.S. at 579 (referencing § 107(1)). The crux of this commercial/non-profit distinction is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. As the complaint makes clear, Defendants did not directly profit from the Flyer, copies of which were distributed to voters free of charge.

Even though the Defendants saved money by not licensing the Photograph or commissioning an original one of their own, it is clear that the Defendants' objectives were more "non-profit" than

7

"commercial." *See Henley v. DeVore*, 733 F. Supp. 2d 1144, 1159 (C.D. Cal. 2010) (surveying fair use case law and finding that "[d]istrict courts that have actually considered whether campaign advertisements are commercial in the fair use context come down on the side of noncommercial."); *Kienitz,* 766 F.3d at 759 (finding that defendants' small profit margin—from an unauthorized use of a politician's portrait on a t-shirt—was neutralized by the fact that they "chose the design as a form of political commentary.").[3]

The net result of this Court's first factor analysis is unavailing. On the one hand, the transformative purpose and non-commercial nature of the Flyer weigh in favor of Defendants. On the other hand, Defendants did not need to use the Photograph in order to effectuate their criticism, and the fair use privilege "is not designed to protect lazy appropriators." *Id.* Given this deadlock under factor one, I move on to the remainder of the statutory factors, bearing in mind that "the dichotomy at the heart of the first factor between new works that transform and complement the original versus new works that serve as a substitute for and supersede the original, is best understood in terms of the fourth factor." *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C 4664, 2014 WL 3368893, at *9 (N.D. Ill. July 8, 2014) (referencing *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 523 (7th Cir. 2002)).

## 2. The Nature of the Copyrighted Work.

The second statutory factor requires that courts assess the "value of the materials used." *See Campbell*, 510 U.S. at 576 (internal quotations and citations omitted). In so doing, courts generally consider whether the original work is more creative or factual in nature and whether it was published at the time of the allegedly infringing use. *See Harper & Row*, 471 U.S. at 563-64.

---

[3] An additional element that Plaintiffs have encouraged this Court to consider as part of the first factor analysis is the good versus bad faith exhibited by the Defendants in their use of the Photograph. *See, e.g., Harper & Row*, 471 U.S. at 562. Here, Defendants undisputedly intended to criticize the political subject of the Photograph, but criticism is not synonymous with bad faith lest all parodies, satires, and other forms of critique fall outside the realm of fair use. Although the Supreme Court described good faith and fair dealing as required elements of fair use in *Harper & Row,* the Court has since stated that good faith is not central to fair use. *See Campbell*, 510 U.S. 578 n. 18. I therefore do not find it necessary to assess Defendants' good versus bad faith, which is a factual determination that would be of little consequence in this Court's aggregate analysis of Defendants' fair use defense.

In this case, the Photograph was already published and publicly available online when Defendants copied it for use in the Flyer. Moreover, the Photograph bears a factual nature. Although "the fair-use doctrine is not intended to set up the courts as judges of the quality of expressive works," *Ty, Inc.*, 292 F.3d at 523, courts are responsible for evaluating the facial plausibility of the pleadings. *See Ashcroft*, 556 U.S. at 678.

This Court need only inspect the Photograph to characterize it as a "candid image taken of [a politician] at a political event" and primarily factual in nature. *See Kienitz v. Sconnie Nation LLC*, 965 F. Supp. 2d 1042, 1052 (W.D. Wis. 2013). Because Plaintiff Galvin took the Photograph during a live parade, he obviously did not stage the action depicted in it. Whatever artistry he contributed (by way of the angle, framing, or other composition of the Photograph) could not plausibly outweigh its factual nature. I therefore find that the nature of the copyrighted work as a published, factual photograph weighs in favor of Defendants' fair use defense.

### 3. The Amount and Substantiality of the Portion Used.

The third fair use factor examines whether the amount and substantiality of the portion used was reasonable in relation to the copyrighted work as a whole. § 107(3). Because "there is no *per se* rule against copying in the name of fair use an entire copyrighted work," *Chicago Board of Educ.*, 354 F.3d at 629, a reasonable reproduction can include substantial portions of the original. The determination of what qualifies as reasonable harks back to the first statutory factor insofar as "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. For example, a copy that parodies the underlying work may reasonably use a significant portion of the original because "[p]arody needs to mimic an original to make its point," *Henley*, 733 F. Supp. 2d at 1152, whereas "satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell*, 510 U.S. at 581.

It is again relevant that Defendants did not need to use the copyrighted work in order to convey their political message. In order to play off of taglines like "Career Politician . . . in the

9

Driver's Seat" and "Fiscal Responsibility Went out the Window," Defendants needed to show the politician driving a car, but they did not need to use Plaintiff Galvin's copyrighted work in particular. Furthermore, much of the original Photograph was unaltered in the Flyer, including the depiction of the driver, who figures prominently in both works. Given the plethora of alternative means for Defendants to criticize Mr. Yingling and the qualitative similarities between the Flyer and Photograph, I find that the third factor weighs against Defendants' fair use defense.

### 4. Effect Upon Potential Market or Value of the Copyrighted Work.

The fourth factor examines whether and how the unauthorized use will affect the potential market for or value of the copyrighted work. § 107(4). The Seventh Circuit has indicated that this factor is usually the most important. *See Kienitz*, 766 F.3d at 758. When evaluating the market effect of an alleged infringement, courts consider whether it serves as a substitute in both the market for the original work and the market for its legally protected derivatives. *See Campbell*, 510 U.S. at 587. Furthermore, courts must consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original," *id.* at 590 (internal quotations and citations omitted), for "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." *Harper & Row,* 471 U.S. at 566-67 (internal quotations and citations omitted).

In the case of pure parody, it is unlikely that the copy will act as a substitute for the original, since the two works serve different market functions. *Campbell,* 510 U.S. at 591. The same logic applies to derivative markets of criticism, because "[t]he market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market." *Id.* at 592. Despite its clear findings regarding the market effects of parodies, the Supreme Court has eschewed

10

any finding "as to the derivative markets for works using elements of an original as vehicles for satire or amusement, making no comment on the original or criticism of it." *Id.* at 592 n.22.

Absent guidance regarding "looser" forms of criticism like satires and political commentaries, this Court has conducted a side-by-side analysis of the Photograph and Flyer and reasons that the latter is a "complement" to rather than a "substitute" for the former. *See Kienitz*, 766 F.3d at 758 (finding that a t-shirt depicting an altered portrait of a politician in order to comment on his politics is complementary). Considering only the loss to potential licensing revenues from "traditional, reasonable, or likely to be developed markets," *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 560 (S.D.N.Y. 2013) (internal citations and quotations omitted), I find that the Flyer has not and will not plausibly cut into demand for the Photograph.

A basic comparison of the two works reveals that they cater to wholly different audiences. Anyone who wants an accurate depiction of the political parade or Mr. Yingling's campaign activities (for example, a media outlet interested in using the Photograph for a news story) would not plausibly license the Flyer instead. *See New Era Publications Int'l, ApS v. Carol Pub. Grp.*, 904 F.2d 152, 160 (2d. Cir. 1990) (stating that "a critical biography serves a different function than does an authorized, favorable biography, and thus injury to the potential market for the favorable biography by the publication of the unfavorable biography does not affect application of factor four."). In fact, the Flyer may have increased market demand for the Photograph given the attention it ostensibly brought to the election and political campaign of Mr. Yingling. In the event that the Flyer impaired the market for the Photograph, the only plausible way it could have done so is as a "negative complement," *Ty, Inc.*, 292 F.3d at 518, much like a book review or parody that criticizes the subject matter of the copyrighted work.

The Seventh Circuit has acknowledged that such "negative complements" can impair a plaintiff's "long-range commercial opportunities" even if a defendant's unauthorized use does not reduce the value derived from the plaintiff's original work. *See Kienitz*, 766 F.3d at 759. In *Kienitz*,

the Seventh Circuit found that the defendants' unauthorized use of a mayor's portrait on a political t-shirt was a fair use, but the court surmised *in dicta* that fewer politicians might hire the plaintiff as a photographer if they think the high quality of his work would make his photographs more effective when used against them. *Id.*

In this case, however, Plaintiffs do not argue that fewer people will hire or cooperate with Mr. Galvin given Defendants' use of his work. Rather, Plaintiffs' only argument related to market effect is that Defendants' political commentary harms the reputation of Mr. Galvin's subjects and thus the value of his photographs. Avoiding this result is simply not a purpose of copyright law. Fair use analyses do not take account of commercial depreciations that are due solely to critical commentary of underlying works. *See Campbell*, 510 U.S. at 570, 592 (stating that "[t]he cognizable harm is market substitution, not any harm from criticism" and that "the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps it.") (internal quotations and citations omitted).

Potential market harm due to the blemished reputation of the politician depicted in the Photograph is not protected by Plaintiff Galvin's copyright. *See New Era Publications*, 904 F.2d at 160 (stating that "even if [an unfavorable biography] ultimately harms sales of the authorized biography, this would not result from unfair infringement . . . but rather from a convincing work that effectively criticizes [the subject of the biography], the very type of work that the Copyright Act was designed to protect and encourage."); *Dhillon v. Does 1-10*, No. C 13-01465 SI, 2014 WL 722592, at *5 (N.D. Cal. Feb. 25, 2014) (holding that unauthorized use of politician's headshot to criticize her politics is "precisely what the Copyright Act envisions as a paradigmatic fair use."); *Katz v. Chevaldina*, No. 12-22211-CIV-KING, 2014 WL 2815496, at *1 (S.D. Fla. June 17, 2014) (finding unauthorized use of unflattering photo of businessman in a blog that is critical of his business practices to be fair use as a matter of law).

For these reasons, I find that the fourth factor weighs in favor of Defendants' fair use

defense.

## IV.     CONCLUSION

Given findings in favor of the Defendants under the second and fourth factors—the latter of which is afforded the most importance by the Seventh Circuit, *see Kienitz*, 766 F.3d at 758, I conclude that the Defendants have raised a satisfactory fair use defense. The findings in favor of the Plaintiffs under the third factor do not outweigh the preceding findings in favor of the Defendants; the same would hold true if the first factor analysis were resolved in Plaintiffs' favor. Therefore, Plaintiffs' copyright infringement claims are precluded by Defendants' affirmative defense under § 107, and Counts I-VI are dismissed. Plaintiffs' civil conspiracy claims under Count VII (conspiracy to infringe Plaintiffs' copyright) are also dismissed, for "[w]here . . . a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 432 (2000).

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: September 9, 2015